(C. D. 1216)

## THE GRUEN WATCH COMPANY *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 1, 1950)

*Taft, Stettinius & Hollister* (*Alan R. Vogeler* and *John H. Clippinger* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Joseph F. Donohue* and *Michael Stramiello, Jr.,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

EKWALL, Judge: This case primarily involves the question of the proper rate at which the currency of the invoices covering certain watch cases imported from Switzerland should be converted into United States dollars under the provisions of section 522 (c)[1] of the Tariff Act of 1930 (31 U. S. C. 1940 ed. § 372). In substance, the pleadings allege that after the merchandise was appraised an attempted second appraisement was made, that said second appraisement was illegal, and that the collector in liquidating upon the basis of said second appraisement also acted illegally. Further, it is alleged that the liquidation made in conformity with an appraisement in "free Swiss francs" under instructions from the Secretary of the Treasury is a nullity and that the action of the Federal Reserve bank in retroactively certifying to the Secretary a buying rate for the period covered by the importations here involved is invalid and such rate

---

[1] Section 522 (c) provides:

"(c) MARKET RATE WHEN NO PROCLAMATION.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange."

cannot legally be used in valuing imports and assessing duties thereon.

The facts as established by a stipulation of counsel (exhibit 1) and the testimony, insofar as pertinent, are as follows. The plaintiff imported from Switzerland in the year 1943 certain watch cases, movements, and parts and entered the same at the port of Cincinnati, Ohio. This merchandise was covered by three invoices which were made out in Swiss francs. On entry, the customs broker who prepared the entry papers expressed the value in United States dollars. The merchandise was examined and appraised in June 1944, the entered value being approved, as indicated by a check mark on the summary sheet. At the time of the appraisal, the Secretary of the Treasury had received from the Federal Reserve bank no certification of the buying rate for Swiss francs. Therefore, the collector of customs, when the papers were transmitted to him, was without either estimated or proclaimed values for Swiss francs, as provided by section 522 (c), *supra.* Importation having been made at the subport of Cincinnati, the papers were transmitted by the acting appraiser at Cincinnati, who made the appraisement, to the headquarters port of Cleveland. Due to the fact that no certified rates of exchange for Swiss francs were available to the collector, he withheld liquidation until 1946, at which time the Treasury Department issued instructions for the conversion of Swiss francs. (T. D. 51398.)[2] After receipt of these instructions the papers were returned to the appraiser at Cincinnati for action in conformity therewith.

The appraiser at Cincinnati thereupon altered the Summary of Examination and Appraisement sheet by drawing a red-ink line through the date of the original appraisement and the name of the

---

[2] We quote a portion of the instructions as follows:

\* \* \* \* \* \* \*

"In the case of each importation in which appraisement has been withheld, is incomplete, or in which liquidation has been suspended pending certification by the Federal Reserve bank of a rate or rates for the Swiss franc for a date between August 2, 1943, and June 30, 1944, both inclusive, the appraiser and collector shall proceed, respectively, with the appraisement and liquidation as follows:

"1. No rate of exchange shall be used for customs currency conversion purposes except a rate certified by the Federal Reserve bank for the date of exportation of the merchandise, even if information be presented to show that a transaction was consummated in some alleged class of currency for which no rate has been certified.

"2. Where the importation consists of merchandise other than clocks, watches, or parts, movements, or cases thereof, the only type of Swiss franc in which appraisement shall be made shall be the official franc and the official rate for the date of exportation shall be used for customs purposes, unless the appraiser or collector has reason to believe that the free rate actually was used in connection with the payment or conversion of the amount paid for the merchandise and that such use of the free rate was permissible or required under Swiss law, in which event the case shall be referred to the Commissioner of Customs.

"3. Where the importation consists of clocks, watches, or parts, movements, or cases thereof, the only type of Swiss franc in which appraisement shall be made shall be the free franc and the free rate for the date of exportation shall be used for customs purposes.

"4. For purposes of appraisement, when there are both a foreign and an export value and they are in different currencies, the appraiser shall apply the appropriate rate to the value expressed in dollars in order to obtain a corresponding value expressed in francs for the purpose of comparing the export value with the foreign value."

\* \* \* \* \* \* \*

acting appraiser who had made that appraisement, inserted a date in 1946 and his own name as appraiser of merchandise, and in the column headed "Remarks" wrote the words "Free Swiss Fcs. T. D. 51398."

It is claimed on the part of the plaintiff that this amounted to a second appraisement and therefore was illegal. The Government in its brief concedes the correctness of this claim on authority of the case of *United States* v. *Gothic Watch Co.*, 23 Cust. Ct. 235, Reap. Dec. 7712, where, upon a state of facts on all fours with the case at bar, a special division of this court, sitting in reappraisement, held that the attempted reappraisement was illegal, null, and void, that the original report of the appraiser was complete and legal, and that since no appeal for reappraisement was taken therefrom within the time provided by statute, it became final and conclusive on all parties. (Section 501, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.)

In connection with the original and only legal appraisement in this case, the acting appraiser testified that the currency in which such appraisement was made was "Swiss francs"; that at the time of appraisal he had no specific knowledge of the existence of a "Free" or an "Official" rate for Swiss francs; that he did not take into consideration the value of the Swiss franc for the reason that such action is not within his authority; that he left that to the collector. His action is in line with the provisions of the Customs Manual of 1943, section 14.2 (i).[3] The court in the *Gothic Watch Co.* case, *supra*, discussed the duty of the appraiser under the statute as follows:

It is the duty of the appraiser to find the value of the merchandise in the unit of quantity in which the merchandise is usually bought and sold and to express such value in that currency of the country of exportation in which such or similar merchandise is usually bought and sold in the ordinary course of trade in such country. (Section 500, Tariff Act of 1930; section 14.2 (e) and (f), Customs Manual of 1943.) Therefore, if the merchandise was usually bought and sold in a currency for which no value had been proclaimed or certified, the appraiser would nevertheless have to appraise in terms of that currency and it would be the duty of other agencies of the Government to establish the value of that currency in United States funds. The only time the appraiser has anything to do with conversion of the currency is when the merchandise is sold in different currencies in the country of exportation, in which case conversion may be made for purposes of comparison. (*Klingerit, Inc.* v. *United States*, 14 Cust. Ct. 435, Reap. Dec. 6159; section 14.2 (h), Customs Manual of 1943.) Otherwise, the only currency question for determination by the appraiser is how many units of

---

[3] Section 14.2 (i) reads as follows:

"Appraising officers have no authority to state in a report to the collector the value of the currency of appraisement. The only currency question ordinarily for determination by the appraiser is how many units of the currency in which the goods are appraised are necessary to make market value on the date of exportation. When a rate of exchange has been agreed upon between the exporter and the importer, that fact is of interest to appraising officers only insofar as it indicates the true currency in which the transaction is effected. * * *."

the currency in which the goods are appraised are necessary to make market value on the date of exportation. (Section 14.2 (*i*), Customs Manual of 1943.) In other words, it is the duty of the appraiser to value the goods as of the time of exportation in the currency of the country from which they are imported and it is the duty of the collector to convert that valuation into United States currency at the proclaimed or certified rate. *Masson* v. *United States*, 1 Ct. Cust. Appls. 149, T. D. 31209. Note also *Giovanni Ascione* v. *United States*, 32 Treas. Dec. 725, T. D. 37252, where the court said (p. 729):

* * * The appraiser in arriving at the value has nothing to do with the conversion of money at any time or any part of the proceeding. He must find the value of the merchandise in the ordinary course of trade in the country of exportation in the currency used by the people of that country. No fine-spun theory as to depreciated currency is within his jurisdiction whatever. There is another officer who will take care of that proposition.

That case also passed upon the question of whether there were two classes of currencies in use in Switzerland at the time this merchandise was exported, as follows:

In the instant case there is no evidence that the merchandise was bought and sold in Switzerland in more than one currency. The currency used was Swiss francs in all cases, the only difference being that the Swiss francs were bought at different rates of exchange. The appraiser's report of January 6, 1944, therefore complied with the regulations in appraising the merchandise as entered in Swiss francs. It was then the duty of the collector to ascertain the value of said Swiss francs in American currency in accordance with the rates proclaimed by the Director of the Mint or certified by the Federal Reserve bank. In cases where a rate has not been certified, the collector is directed to request a rate from the Customs Information Exchange. (Section 16.4, Customs Manual of 1943.)

The collector of customs who made the liquidation testified that his action was based upon the attempted second appraisement which was made in "Free Swiss francs." It is therefore apparent that the liquidation was based upon an illegal appraisement and is itself illegal and void. *United States* v. *Tampa Box Co.*, 15 Ct. Cust. Appls. 360, T. D. 42561; *Carey & Skinner* v. *United States*, 16 Ct. Cust. Appls. 382, T. D. 43118; *United States* v. *Alex. Murphy & Co.*, id. 461, T. D. 43210; *James S. Kean* v. *United States*, 20 C. C. P. A. (Customs) 388, T. D. 46186. The increased duties having been based upon a void act of the collector, the Government had no legal claim against plaintiff for the same at the time such demand was made. We cannot speculate upon what action the collector will adopt in making a legal liquidation and therefore express no opinion as to the validity of the instructions contained in T. D. 51398, *supra*. In view of our conclusion, it would serve no useful purpose for this court to pass upon the various interesting legal points which have been so ably presented in the briefs filed.

In arriving at our conclusion, we are not unmindful of the problems confronting the customs officials in the abnormal currency situations precipitated by the war. However, the court must interpret the law

as it exists and leave to the legislative body the task of enacting such laws as may be necessary in view of the changed world situation.

We therefore sustain plaintiff's claim that the so-called appraisement upon which the collector based his liquidation is illegal, that the liquidation is likewise illegal, null, and void, and further that a legal liquidation should be had which would form the basis for a protest in which, should it so desire, the importer may litigate any questions presented by such action under section 514 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1514).

Judgment will be rendered accordingly.